**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**                                        **1:05-cr-135-WSD**

**THOMAS A. BROOME, et al.,**

                                **Defendants.**

## ORDER

This matter is before the Court on the Magistrate Judge's Report and

Recommendation [101] regarding Defendant Broome's Motion to Suppress [79]

and Defendant Broome's Objections to the Report and Recommendation [104].

## Background

On or about May 11, 2005, Defendant Broome ("Defendant") was indicted

on charges that, in or about January 2004, and continuing until on or about March

3, 2005, he and co-defendant Nathan Grier knowingly and intentionally conspired to

possess, with the intent to distribute, in excess of five kilograms of cocaine, a

Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

On August 10, 2005, Defendant moved to suppress evidence obtained by federal

agents in connection with a search of the aircraft he was piloting and on which

cocaine was discovered during a search.  Defendant claims the federal agents'

warrantless search of the aircraft and alleged seizure of him prior to his formal

arrest did not fall within a recognized exception to the warrant requirement of the

Fourth Amendment and therefore any and all evidence obtained as a result of the

search must be suppressed.

The parties submitted briefs in support of and in opposition to Defendant's

motion.  In addition, a suppression hearing was held by the Magistrate Judge on

September 14, 2005, at which the Government presented the testimony of the

federal agents involved in the investigation and arrest of Defendant.[1]  On November

15, 2005, the Magistrate Judge issued his Report and Recommendation denying

Defendant's Motion to Suppress.  Defendant subsequently filed objections to the

Report and Recommendation.

**<u>Standard of Review</u>**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Criminal Rule 58.1, district

judges are required to make a *de novo* determination of those portions of the

---

[1]  The transcript for the September 14, 2005 suppression hearing is cited as
"Tr. at __."

2

Report and Recommendation to which objection is made.  28 U.S.C. §

636(b)(1)(B); L. Cr. R. 58.1(A)(3)(a).  This requires that the undersigned "give

fresh consideration to those issues to which specific objection has been made by a

party."  Jeffrey S. by Ernest S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512

(11th Cir. 1990) (quoting H.R. 1609, 94th Cong., § 2 (1976)).  After conducting a

careful and complete review of the Magistrate Judge's findings and

recommendations, the undersigned may accept, reject or modify, in whole or in

part, the Report and Recommendation.  28 U.S.C. § 636(b)(1).

## Discussion

Defendant argues the Magistrate Judge erred in holding (1) that the agents'

Terry stop after he landed did not exceed its constitutional scope; (2) that the

agents' request to interview Defendant at the airport office did not constitute an

arrest; (3) that Defendant consented to the post-arrest searches of his briefcase and

the aircraft; (4) that the agents' searches of his briefcase, the aircraft and the

luggage found within the aircraft, even if not consented to by Defendant,

constituted searches incident to a lawful arrest; (5) that the agents' searches of the

aircraft and the luggage found within the aircraft, even if not consented to by

Defendant, constituted appropriate searches under the vehicle exception to the

Fourth Amendment.  The Court shall give fresh consideration to these issues.[2]

### *The Terry Stop*

The Magistrate Judge concluded that the Terry stop conducted by the

federal agents after Defendant landed at the Hot Springs, Arkansas airport was

supported by reasonable suspicion and that none of the agents' actions or

questions unreasonably extended the stop or fell outside the scope permissible

under the Fourth Amendment.  (R&R at 13-19.)  Although Defendant does not

challenge that the initial stop was supported by reasonable suspicion, he argues

Agent Wells' warrantless search of the aircraft and his further questioning of

Defendant in the airport's fixed base operator building ("FBO building") "flagrantly

exceeded the constitutional restrictions for a Terry investigative stop, in violation of

[Defendant's] Fourth Amendment rights."  (Def.'s Objections to R&R at 6.)  The

Court disagrees.

The Eleventh Circuit has instructed that a Terry stop, although supported by

reasonable suspicion, usually must "'last no longer than is necessary to effectuate

---

[2] Except as otherwise noted below, Defendant has not objected to the facts
set out by the Magistrate Judge in the Report and Recommendation.  Finding no
plain error, the Court adopts those facts as the factual findings of the Court.

4

the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.'"  United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).  Here, significant information was known by Agent Wells to support his reasonable suspicion that Defendant was involved in smuggling narcotics.  Agent Wells knew (i) that drug traffickers regularly use small airports and private airplanes to smuggle narcotics, (ii) that there existed a pattern of smuggling from Los Angeles to Atlanta, (iii) that drug smugglers typically misidentify their aircraft while in flight to hide their movements, conceal their identity and avoid detection, (iv) that Defendant and Maciel had a history of suspicious activity together, including the 1994 incident involving the seizure of several hundred thousands of dollars, (v) that Defendant recently made false statements to federal agents in an apparent attempt to conceal his ongoing association with Maciel, (vi) that the aircraft being piloted by Defendant was owned by Maciel; and (vii) that Defendant, while en route, had changed his authorized destination several times and had begun using a different tail number to identify his aircraft.  See United States v. Sokolow, 490 U.S. 1, 7-8 (1989) (holding that "reasonable suspicion" is determined from the totality of the circumstances, and from the collective knowledge of the officers involved in the stop); United

States v. Arvizu, 534 U.S. 266, 273-74 (2002) ("This process allows [agents] to

draw on their own experience and specialized training to make inferences from and

deductions about the cumulative information available to them that 'might well elude

an untrained person.'") (citation omitted).

As the Magistrate Judge concluded, this information was more than sufficient to

authorize Agent Wells to approach Defendant and question him to determine if he

was in fact involved in smuggling narcotics.  (See R&R at 18.)  Defendant does not

challenge this conclusion but challenges the scope of the stop.

Agent Wells' detention of Defendant, however, did not last longer than

necessary to effectuate the purpose of the stop and the scope of the agents'

conduct was carefully tailored to the reasonable suspicion which gave rise to the

stop.  It is undisputed that the entire encounter, including the time necessary to

effectuate the stop, review Defendant's license and documentation, conduct the

search of the airplane, question Defendant and coordinate the drug-detection dog's

examination of the aircraft, took no more than thirty minutes.  (R&R at 18) (citing

Tr. at 126-27).  The evidence also demonstrates that Agent Wells' questioning and

other conduct were carefully tailored to determining whether Defendant was

involved in drug smuggling.

6

The duration of the stop and scope of the agents' conduct was justified by the reasonable suspicion that existed prior to the initial encounter with Defendant, as well as the facts which developed during Agent Wells' questioning.  Defendant initially refused to identify the owner of the aircraft, and when he did identify Maciel as the owner, lied to Agent Wells by claiming that he did not know Maciel's first name.  (Tr. at 68-69.)  Defendant again lied to Agent Wells in stating that he only met Maciel two years ago and that this was only the second flight he had piloted for him.  (Id. at 7-71.)  Defendant claimed that the purpose of the flight was to bring the plane to Atlanta for inspection by a potential buyer, an explanation which was inconsistent with the flight plan filed by Defendant, the condition of the aircraft at the time of the flight (Agent Wells testified that there was trash and empty plastic containers scattered about the airplane's interior), and Defendant's stated intention to park the aircraft at Peachtree-DeKalb Airport in Atlanta, leave it unlocked overnight, and then return to Los Angeles on a commercial flight the next day.  (Id. at 68-69, 76-78.)  Agent Wells testified that Defendant's behavior throughout the questioning gave him further cause to doubt the truthfulness of his statements.  (Id. at 72-73, 78-79.)  These facts bolstered the agents' already-existing reasonable suspicion that Defendant was involved in illegal activity and justified their further

investigation concerning Defendant's conduct.  Accordingly, Defendant's

objection concerning the scope of the agents' Terry stop is without merit and is

OVERRULED.

### The Alleged Seizure

The Magistrate Judge concluded that the agents' initial encounter with

Defendant inside the FBO building constituted a police-citizen encounter that did

not involve any coercion or detention, and therefore did not implicate the Fourth

Amendment.  (R&R at 16.)  The Magistrate Judge further concluded that,

throughout the course of the agents' questioning, a reasonable innocent

person in Broome's position would have believed that he was free to leave, and that

no Fourth Amendment rights were invoked when Agent Wells asked Broome if he

would accompany the agents to the FBO building and into a conference room.

(Id.)  Defendant argues the Magistrate Judge erred in holding that Agent Wells'

questioning in the FBO conference room did not constitute a seizure under the

Fourth Amendment.  (Def.'s Objections to R&R at 6-9.)  He contends that the

parties' removal from the airport runway to the FBO conference room constituted

an arrest unsupported by probable cause.  (Id.)

Having reviewed the totality of the circumstances surrounding the agents'

8

encounter with Defendant, including their decision to continue their conversation inside the airport building rather than out on the runway, the Court concludes that the encounter did not constitute an arrest under the Fourth Amendment.  The evidence is undisputed that the agents did not physically or verbally restrain, coerce or threaten Defendant, nor did they command Defendant to submit to questioning or indicate to him that he was not free to leave at any time.  (See R&R at 16.) Although the two agents accompanying Agent Wells were equipped with firearms which, for the agents' safety, were unholstered, these weapons were never raised toward or aimed at Defendant, and were not brandished in a threatening manner. (Tr. at 75, 127-29.)  Agent Wells, whose firearm was concealed beneath his flap jacket at all times during the encounter (id. at 91), testified that none of the parties raised their voices and that the conversation remained polite throughout the encounter. (Id. at 73, 75.)

Following the search of the aircraft, to which Defendant consented, and because of the drizzling rain and cold outside temperature, Agent Wells suggested that they go inside the FBO building to talk.  (Id. at 73, 107, 111.)  Defendant did not object to Agent Wells' suggestion to move inside the building; instead, he picked up his personal belongings and followed the agents inside.  (Id. at 111-12,

114.)  The FBO conference room in which the parties continued their conversation was well lit and included a large window, and the circumstances of the questioning did not indicate that it was custodial in nature.  (Id. at 74-75, 128-29.)  Agent Wells and Defendant sat next to each other at the end of the table closest to the door, facing the window, and Mr. Summers -- the only other person in the room -- sat on the other end, approximately eight feet away.  (Id.)  Although the agents requested that Defendant obtain permission before reaching into his personal belongings, he was advised that this limited restriction was for safety purposes only and he was not denied permission to retrieve anything from his bag.  (Id. at 114.)

Defendant argues that Agent Wells' suggestion that the parties talk inside constituted a warrantless arrest, citing United States v. Robinson, 690 F.2d 869 (11th Cir. 1982), and United States v. Hill, 626 F.2d 429 (5th Cir. 1980).  (Def.'s Objections to R&R at 6-9.)  Robinson and Hill are part of a line of cases addressing whether, in the particular context of an airline passenger being stopped in an airport terminal, an agent's request for the passenger to accompany him to a private office within the airport constitutes an arrest.  See Robinson, 690 F.2d at 872; Hill, 626 F.2d at 432.  In Robinson, a federal Drug Enforcement Administration ("DEA") agent stopped an airline passenger that he suspected of

10

drug smuggling.  Robinson, 690 F.2d at 871.  The agent identified himself as a

federal narcotics agent and stated that he was looking for drugs coming into the

airport.  Id.  He asked the passenger whether he was carrying any narcotics on his

person or in his briefcase, and took possession of and retained the passenger's

airline ticket and license during the course of his questioning.  Id. at 871-72.  The

passenger denied carrying any narcotics, at which point the agent asked whether he

would consent to a search of his person and briefcase, either on the spot or in a

private office located elsewhere in the airport.  Id.  Although the passenger

consented to the search (which revealed he was carrying cocaine), the Fifth Circuit

subsequently invalidated the search and excluded the evidence obtained as a result.

Id. at 874-76.  The court concluded that the passenger's consent to the search was

not voluntary because, as of the moment the agent expressly asked the passenger

whether he was carrying any drugs, a seizure for Fourth Amendment purposes had

occurred.  Id. at 876.  The court reasoned that the agent's statements "intimate[d]

that an investigation had focused on a specific individual (and) easily could induce

a reasonable person to believe that failure to cooperate would lead only to formal

detention."  Id. (citation omitted).  The court also found important the fact that the

agent retained the passenger's airline ticket and driver's license throughout the

11

conversation, further supporting a reasonable person's belief that he was not free to go.  Id. at 875.

Hill also involved a DEA agent's questioning of an airline passenger that he suspected of drug smuggling.  Hill, 626 F.2d at 431.  In that case, the agent identified himself as a narcotics agent and told the passenger that he was looking for narcotics coming through the airport.  Id.  He told the passenger "I'm going to ask you for your cooperation in allowing yourself to be very quickly searched for drugs or narcotics."  Id.  The passenger replied, "Not without a search warrant." Id.  The agent again requested the passenger to consent to a search, stating that he had nothing to fear from a search if he was not carrying drugs, and the passenger again refused.  Id. at 431, 435.  The agent then pointed to an office across the rotunda of the airport and said, "Well, I'm going to ask you if you'll come with me over to that office where there is a telephone."  Id. at 431.  The passenger did not say anything, but followed the agent.  Id.  On the way to the office, the passenger placed his hand inside his coat pocket.  Id.  When the agent asked him to remove it, the passenger fled down the concourse.  Id.  He was subdued, handcuffed and searched, and the agent discovered he was carrying PCP.  Id.

The Eleventh Circuit held that the agent's request for the passenger to

12

accompany him to the office "constituted a significantly greater intrusion than a brief Terry stop and, thus, must be classified as an arrest requiring probable cause." Id. at 435.  The court reasoned that the confrontational nature of the agent and passenger's interaction to that point (two refusals to consent to a search, prompting the suggestion of a visit to the office) indicated that the interrogation could no longer be characterized as "brief" or "on-the-spot" and that the request signaled the beginning of a more extended interrogation which was to occur in a place other than where it began.  Id.  The court also relied on the fact that the passenger was never informed that he was "free to go," and that the circumstances surrounding the request indicated that the passenger "would have been physically restrained if he had refused to accompany [the agent] or had tried to escape his custody." Id. at 435-436.  Finally, the court noted that the circumstances indicated the detention involved here was for the purpose of interrogation.  Id.

The facts of Defendant's encounter with the agents are materially different from those present in Robinson and Hill.  First, unlike in Hill, where the removal to an office was prompted by the passenger's refusal to cooperate with the agent, it is undisputed that Agent Wells' suggestion to move inside was prompted by the inclement weather and his belief that the airport building would be a more

convenient and comfortable place for them to talk.  Second, in contrast to the

offices at issue in <u>Hill</u> and <u>Robinson</u>, the conference room used by the parties in

this case was neutral turf -- it was not controlled by the agents, rather, it was foreign

to both parties.  As a commercial pilot, Defendant would have been well aware that

the FBO facility and conference room were available for use by those visiting the

airport and that the agents had no greater control over this environment than he did.

Indeed, Agent Wells needed to ask airport personnel whether a conference room

was available and whether they could use the room for the discussion.  (Tr. at 73.)

The removal of the parties' discussion to a more convenient, comfortable and

public location not exposed to the elements is qualitatively different than the

proposed change in location in <u>Hill</u> and <u>Robinson</u>, which involved leaving a public

area of the airport and traveling to a private office apparently controlled by the

investigating agent.  Third, unlike the agent in the cases cited by Defendant, Agent

Wells did not make any statements or undertake any action (such as an undue delay

in returning Defendant's pilot's license and documentation to him) which would

indicate to Defendant that the stop was part of an investigation focusing on him or

which would lead a reasonable, innocent person to believe that failure to cooperate

would lead only to formal detention.  Instead, the record is clear that Agent Wells

14

informed Defendant that the purpose of the stop was merely to clarify for security purposes why Defendant had identified himself using an incorrect tail number.  (See Tr. at 73) ("Q:  Did you tell him that you suspected him of doing something?  A: No.  All we told him was that [he] changed tail numbers and being post 9-11, we are . . . Department of Homeland Security, [and] one of the things we do now is just check out these issues, and so that's what we are going to do.  We just want a clarification of why [he] changed his tail number."); (see also Tr. at 72) ("And then [Defendant] asked me, 'Well, why are you stopping me?  I didn't do anything wrong.'  At that point, Mr. Jackson . . . told [Defendant] that, well, he had changed tail numbers over Amarillo and that was consistent with smugglers or terrorists, you know, tactics, and that's why.  We just wanted to clear up this issue.").

Because the totality of the circumstances surrounding the agents' encounter with Defendant supports the conclusion that the encounter did not constitute an arrest, Defendant's objection is OVERRULED.

### *Defendant's Consent to Post-Arrest Searches of His Briefcase and the Aircraft*

The Magistrate Judge concluded that Defendant voluntarily consented to Agent Wells' warrantless, post-arrest search of his briefcase and the aircraft.

(R&R at 23-25.)  Defendant challenges this finding, arguing that the circumstances surrounding his arrest were of such a coercive nature that his consent cannot be deemed voluntary.  (Def.'s Objections to R&R at 12-14.)  This argument is unsupported by the record, which demonstrates that (1) the agents' conduct toward Defendant, both before and after his arrest, was not coercive, threatening or intimidating; (2) that Defendant did not object or otherwise indicate he opposed the retrieval of the keys from his briefcase or the search of the aircraft; (3) that Defendant was aware of and unafraid to exercise his right to refuse consent to the search, as shown by his earlier refusal to consent to the search of his personal belongings; and (4) that Defendant also was aware of his right to remain silent following his arrest, having been read his Miranda rights just moments before Agent Wells asked if Defendant objected to his retrieving the keys from the briefcase. (Tr. at 82, 119-20, 136-39.)  See generally United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995) ("The voluntariness of the consent must be judged in the light of the totality of the circumstances."); United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002) ("In determining the voluntariness of a defendant's consent, . . . a court must look at several factors, which include whether the defendant was "free to leave," whether there was "coercive police procedure," "the

16

extent of [the] defendant's cooperation or awareness of a [right to] refuse to consent," "whether [the defendant] could refuse to consent," the extent of the defendant's "education and intelligence," and the defendant's "belief that no incriminating evidence would be found.") (citing United States v. Gonzalez, 71 F.3d 819, 830-31 (11th Cir. 1996)).  Based on these undisputed facts, the Court finds Defendant voluntarily and freely consented to Agent Wells' retrieval of the keys from his briefcase and his search of the locked fore and aft compartments of the aircraft.[3] [4]

---

[3] It is unclear from Defendant's objections whether he also challenges the voluntariness of his consent to Agent Wells' initial search of the aircraft's interior immediately after Defendant was approached by the agents.  (See Def.'s Objections to R&R at 12-13.)  If so, this challenge is without merit.  The facts here are that Agent Wells asked Defendant if he could search the cabin of the aircraft, and Defendant did not object.  (Tr. at 71.)  Instead, he merely explained that he did not have the key to the locked fore and aft compartments of the aircraft, and wasn't certain of the contents of the cabin.  (Id.)  Agent Wells suggested Defendant advise him what items in the interior were his personal items, and that they would separate these from the rest of the cabin's contents.  (Id.)  Again, Defendant did not object.  (Id.)  Viewing the totality of the circumstances surrounding the search, the Court finds that Defendant consented to the search and that his consent was voluntarily given.

[4] Agent Wells' post-arrest search of the aircraft revealed four pieces of luggage locked within the fore and aft compartments.  (Tr. at 138-39.)  The record indicates this luggage was brought to the room where Defendant was being held, and that Agent Wells and Defendant had a discussion concerning the luggage.  (Id.)  During this discussion, Defendant stated that he believed the luggage contained

*Post-Arrest Searches of Defendant's Personal Belongings, the Aircraft and the Luggage as Searches Incident to Arrest*

The Magistrate Judge also concluded that the agents' post-arrest, warrantless searches of Defendant's personal belongings (the briefcase, laptop and other personal effects removed to the FBO conference room), the aircraft and the luggage found in the fore and aft compartments were justified as searches incident to Defendant's lawful arrest.  (R&R at 25-27.)  Defendant objects to this conclusion, arguing that the search of the aircraft and luggage cannot be viewed as a search incident to arrest because neither the aircraft nor the luggage was within his immediate control at the time of his arrest.  (Def.'s Objection to R&R at 12-13.)[5]

_____

cocaine.  (Id.)  The luggage was searched by police, and the search revealed that the luggage did, in fact, contained cocaine.  (Id. at 139-40.)  Although it is clear from the record that Defendant had waived his Miranda rights and was cooperative with the agents following his arrest, even by voluntarily identifying the alleged contents of the luggage, the transcript does not contain testimony regarding whether Defendant consented to the search of the luggage.  In the absence of such testimony, the Court cannot satisfy itself that this search was consented to by Defendant, and so does not rely on consent as a justification for the search.

[5] Defendant also objects to the Magistrate Judge's conclusion that the agents' post-arrest search of Defendant's personal belongings was lawful.  (Def.'s Objections to R&R at 15-16.)  The Magistrate Judge concluded that, upon their arrest of Defendant, the agents were authorized to search the area within his immediate presence -- his person and those personal belongings which initially had been brought to the FBO building (the briefcase, laptop and other personal affects) -- in order to (1) search for weapons or items that could be used to injure the

18

A warrantless search is per se unreasonable under the Fourth Amendment unless it falls within one of several specifically established and well-delineated exceptions.  Holmes v. Kucynda, 321 F.3d 1069, 1082 (11th Cir. 2003) (citing Mincey v. Arizona, 437 U.S. 385, 390 (1978)).  A search incident to arrest is one of the exceptions.  Holmes, 321 F.3d at 1082.  It permits an arresting officer "to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape," as well as to search for and seize evidence in the immediately surrounding area "into which an arrestee might reach in order to grab a weapon or evidentiary items."  Id. (citations omitted).

---

agents; (2) to search for additional contraband; and (3) to collect and preserve evidence of the crime.  (R&R at 29-30.)  Defendant does not challenge that the search of Defendant's person and these items which occurred in connection with his arrest was unlawful; rather, he argues that the agents conducted an unlawful search of Defendant's personal belongings prior to arrest when Agent Wells searched the aircraft's cabin.  (See id.)  This argument is not supported by the record.  Agent Wells testified that, during the course of his search of the aircraft, Defendant verbally identified his personal belongings.  (Tr. at 71-72.)  These items, including a laptop computer, a duffle bag, a briefcase and some personal effects, were removed from aircraft and placed on the wing.  (Id.)  After he completed his search of the aircraft, Agent Wells asked for Defendant's consent to search his personal belongings.  (Id. at 72.)  Defendant did not consent to this search, and, as a result, Agent Wells did not search Defendant's personal belongings until after his arrest inside the airport building.  (Id. at 72, 122.)  Accordingly, Defendant's objection concerning the agents' search of his personal belongings is OVERRULED.

"However, the 'search incident to arrest' is a limited exception; it places a temporal and a spatial limitation on searches incident to arrest, excusing compliance with the warrant requirement only when the search is substantially contemporaneous with the arrest and is confined to the immediate vicinity of the arrest."  Id. (citing New York v. Belton, 453 U.S. 454, 465 (1981)) (internal punctuation omitted).

Here, the record is clear that, at the time of his arrest, Defendant was in a conference room within the airport FBO building.  (Tr. at 121-22, 136-40.)  He was not capable of reaching into any part of the aircraft, which was still parked on the runway outside the building, or the luggage locked in the fore and aft compartments of the aircraft, to grab a weapon or destroy evidence.  Accordingly, the Court cannot find that Agent Wells' searches of the aircraft and luggage were proper searches incident to arrest, and Defendant's objection in this regard is SUSTAINED.  See Holmes, 321 F.3d at 1082 (holding that pre-arrest search of suspect's bedroom did not qualify as search incident to arrest where suspect arrested minutes later in the living room and so the search of the bedroom "was not contemporaneous with, or conducted in the vicinity of, [the] arrest."); United States v. Chapman, 196 F. Supp. 2d 1279, 1286-87 (M.D. Ga. 2002) (holding that police officers' search of the defendant's vehicle could not be justified as search incident

20

to arrest because, prior to the search of the car, defendant had been handcuffed and was inside of a nearby house:  "[T]he car did not need to be searched without a warrant to prevent [the defendant] from gaining possession of a weapon. Furthermore, it defies common sense to suggest that the car needed to be searched without a warrant in order to prevent [the defendant] from destroying evidence.  He was in custody secured by handcuffs and nowhere near the car.").

### *Post-Arrest Search of the Aircraft and Luggage Under the Vehicle Exception to the Fourth Amendment*

The Magistrate Judge further concluded that the post-arrest, warrantless searches of the aircraft and the luggage found in the fore and aft compartments were justified under the vehicle exception to the Fourth Amendment.  (R&R at 27-29.)  Defendant objects to this conclusion on the ground that, at the time of his arrest, there was no exigency supporting these searches.  (Def.'s Objections to R&R at 14-15.)

If there is probable cause to search a vehicle, a warrantless search is not deemed in contravention of the Fourth Amendment if the facts of the case would have justified a warrant, even though a warrant was not actually been obtained. See United States v. Watts, 329 F.3d 1282, 1285 (11th Cir. 2003) (citing United States

v. Ross, 456 U.S. 798, 809 (1982)).  This exception, known as the "vehicle

exception," permits agents to conduct a warrantless search of a vehicle where they

have probable cause to believe it contains illegal drugs or other contraband.  See

Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) ("If a car is readily mobile and

probable cause exists to believe it contains contraband, the Fourth Amendment . . .

permits police to search the vehicle without more."); Maryland v. Dyson, 527 U.S.

465, 467 (1999) ("[U]nder our established precedent, the 'automobile exception'

has no separate exigency requirement."); Watts, 329 F.3d at 1286 ("[T]his Court

[has] made it clear that the requirement of exigent circumstances is satisfied by the

'ready mobility' inherent in all automobiles that reasonably appear to be capable of

functioning.") (citation and internal punctuation omitted).

    A search authorized under this exception may include the vehicle as well as

any compartment of the vehicle and any containers found therein in which the

objects of the search can be found.  See Ross, 456 U.S. at 825 ("If probable cause

justifies the search of a lawfully stopped vehicle, it justifies the search of every part

of the vehicle and its contents that may conceal the object of the search."); United

States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) ("Under the automobile

exception to the warrant requirement, officers can search any container in an

operational car without a warrant as long as they have probable cause to believe

that the container holds evidence of a crime.").  Although most frequently applied

to automobiles, the vehicle exception is equally applicable to airplanes.  See United

States v. Rollins, 699 F.2d 530, 534 (11th Cir. 1983) (upholding warrantless search

of airplane under the vehicle exception:  "[T]his court can see no difference

between the exigent circumstances of a car and an airplane."); United States v.

Nigro, 727 F.2d 100, 106 (6th Cir. 1984) (holding that vehicle exception applies to

airplanes:  "Although a parked airplane whose occupants are removed is arguably

less mobile than a similarly situated automobile -- given the relatively few persons

capable of piloting an airplane -- an airplane is even more mobile in terms of its

ability to cover great distances in a short time and its capacity to move without

being restricted to discrete roadways.").

　　　　Viewing the totality of the circumstances that existed at the time of the

searches in question, the Court finds the agents had probable cause to believe the

aircraft and the luggage contained illegal drugs.  See Chapman, 196 F. Supp. 2d

1287 (upholding a warrantless search under the vehicle exception where police

officers had probable cause to believe a vehicle contained evidence of illegal drug

activity).  That the agents' searches of the aircraft and luggage here were supported

23

by probable cause is demonstrated by the undisputed evidence that

(1) the drug-detection dog alerted to the fore and aft compartments of the aircraft;

(2) Defendant lied to Agent Wells concerning whether he had keys to these

compartments (he later admitted the keys to these compartments were in his

briefcase); and (3) Defendant stated to Agent Wells, upon discovery of the luggage,

that he believed the luggage contained cocaine.  (Tr. at 80-81, 119, 139.)

Accordingly, Defendant's objection is OVERRULED.

**Conclusion**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Objections to the Report

and Recommendation [101] are **OVERRULED IN PART** and **SUSTAINED IN**

**PART**.  Except for the Magistrate Judge's conclusion that Agent Wells' searches

of the aircraft and luggage were justified as searches incident to arrest, the Court

**ADOPTS AS ITS ORDER** the Report and Recommendation issued by the

Magistrate Judge, and Defendant's Motion to Suppress [79] is **DENIED**.

**SO ORDERED**, this 28th day of February, 2006.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE